IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JANE DOE, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| WILLIAM REESE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the Plaintiff, Jane Doe, by and through her counsel of record, and for her causes of action against the Defendant, William Reese, states as follows:

### JURISDICTION, VENUE, AND PARTIES

1. This Court has jurisdiction pursuant to the provisions of 28 U.S.C. § 1331 with respect to Count I of the Complaint.

2. This Court has supplemental jurisdiction pursuant to the provisions of 28 U.S.C. § 1367 with respect to Counts II, III, and IV of the Complaint.

3. Venue for this action is proper in the United States District Court for the District of Nebraska because the acts and omissions complained of herein occurred in the District of Nebraska.

4. Plaintiff Jane Doe ("Doe") is, and was at all times relevant to this action, a resident of Sarpy County, Nebraska.

5. Plaintiff has filed this Complaint under a pseudonym, as permitted both by 15 U.S.C. § 6851(b)(3)(B) and Neb. Rev. Stat. § 25–3509. *See also Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1077 (8th Cir. 2024).

6. Plaintiff will be filing a motion requesting leave to proceed under a pseudonym forthwith upon the docketing of this case.

7. Defendant William Reese ("Reese"), is, and was at all times relevant to this action, a resident of Douglas County, Nebraska.

## FACTUAL BACKGROUND

### A. Overview

8. This paragraph of the Complaint provides a non-exhaustive summary of the facts giving rise to Doe's claims that are set forth below. In short, Doe has brought this action because Reese—without legal authorization or the consent of Doe—caused intimate visual depictions of Doe to be disclosed to others. These intimate visual depictions were non-commercial in nature, and were sent by Doe to Reese during a time period when Doe and Reese were in a dating relationship with one another. Under the circumstances, Doe reasonably and justifiably expected that the intimate visual depictions she sent to Reese would remain private and would not be shared or disclosed with anyone else. Instead, a few months after Doe broke up with Reese and terminated their dating relationship, Reese intentionally caused these intimate visual depictions of Doe to be disclosed and disseminated to an innumerable and unknown online population, resulting in them appearing on the social media platform "Kik." In so doing, Reese caused significant damage and harm to Doe, both personally and professionally. Doe has brought this action in an effort to seek redress for the damages she has incurred and will continue to incur due to Reese's actions. Specifically, Doe brings forth four separate causes of action for damages: (1) a federal statutory claim pursuant to 15 U.S.C. § 6851; (2) a Nebraska state law statutory claim pursuant to the Uniform Civil Remedies for Unauthorized Disclosure of Intimate Images Act, Neb. Rev. Stat. § 25–3501; (3) another Nebraska state law statutory claim for invasion of privacy under Neb. Rev. Stat. 20–201; and (4) a Nebraska state common law tort claim for intentional infliction of emotional distress. Further details regarding the facts of this case and Doe's four claims are alleged with additional specificity below. Doe also seeks equitable relief, as specified below, in accordance with 15 U.S.C. § 6851(b)(3)(A)(ii), Neb. Rev Stat. § 25–3505(b)(2), and this Court's inherent equitable powers.

### B. The Relationship of the Parties

9. Doe and Reese were in a dating relationship between on or about July of 2024 to on or about August of 2025.

10. During the course of their dating relationship, Doe and Reese were sexual partners and Doe electronically sent Reese images and media depicting her in a sexual nature (collectively referred to as "intimate visual depictions").

11. Doe sent these intimate visual depictions to Reese via text message as part of their ongoing, consensual sexual relationship that the two maintained at the time.

12. Collectively, these intimate visual depictions included media that showed, among other things, the following: (1) the uncovered genitals, pubic area, anus, and post-pubescent female nipple of Doe, and (2) Doe engaging in sexually explicit conduct, as that term is defined by 15 U.S.C. § 6851(a)(6).

13. These intimate visual depictions did not constitute "commercial pornographic content" as that term is defined by 15 U.S.C. § 6851(a)(1).

14. These intimate visual depictions were not produced while Doe was in a public place within the meaning of 15 U.S.C. § 6851(a)(5).

15. Doe never gave Reese any form of consent—affirmative, implied, or otherwise—to show, disclose, distribute, publish, or otherwise disseminate these intimate visual depictions to anyone else.

16. Under the circumstances in which these intimate visual depictions were sent to Reese and the nature of the relationship between Reese and Doe at the time these intimate visual depictions were transmitted from Doe to Reese, Doe reasonably expected that Reese would not show, disclose, distribute, publish, or otherwise disseminate these intimate visual depictions to anyone else.

17. Under the circumstances in which these intimate visual depictions were sent to Reese and the nature of the relationship between Reese and Doe at the time these intimate visual depictions were transmitted from Doe to Reese, any reasonable person in Reese's position would have understood that Doe had not consented to the disclosure, distribution, publication, or dissemination of these intimate visual depictions of Doe to anyone else.

18. Reese did, in fact, know that Doe had not consented to the disclosure, distribution, publication, or dissemination of these intimate visual depictions of Doe to anyone else.

19. Indeed, on or about September 6, 2024, Reese and Doe engaged in a text message conversation where Doe asked Reese, "Should I text you dirty pics?" When Reese responded, "Sure[,]" Doe said "Ha! There will be eyes over your shoulder at all times silly." Reese then replied, "No, I'll see them in a way nobody can." Reese proceeded to state, "I'm not letting anyone see those pics. For me only."

20. Alternatively, and at the very least, Reese recklessly disregarded whether Doe consented to such disclosure, distribution, publication, or dissemination of these intimate visual depictions of Doe to anyone else.

21. Someone in Reese's position would have understood that Doe had not consented to the disclosure, distribution, publication, or dissemination of these intimate visual depictions of Doe on any form of internet website or social media platform where such intimate visual depictions would have been viewable and accessible by others.

22. Reese did, in fact, know that Doe had not consented to the disclosure, distribution, publication, or dissemination of these intimate visual depictions on any form of internet website or social media platform where such intimate visual depictions would have been viewable and accessible by others.

23. Alternatively, and at the very least, Reese recklessly disregarded whether Doe consented to the disclosure, distribution, publication, or dissemination of these intimate visual depictions on any form of internet website or social media platform where such intimate visual depictions would have been viewable and accessible by others.

### C. The Termination of the Parties' Relationship

24. In or about August of 2025, Doe decided to cease her dating relationship with Reese, and communicated her intent to end their relationship to him.

25. Doe's decision to terminate their relationship was not received well by Reese.

26. Between August of 2025 and October of 2025, Reese informed Doe that he still wanted to maintain a dating relationship with her, but Doe communicated to Reese that she was not interested in doing so.

27. Although the two were no longer in a dating relationship, they continued to see one another in a platonic capacity, including at a pickleball gym they both routinely attended.

28. However, as time went by, continuing to routinely see Reese at the same pickleball gym was uncomfortable for Doe, so she made the decision to leave that gym and join another pickleball club at a different location.

29. On or about October 8, 2025, at approximately 5:12 p.m., Reese texted Doe and expressed that she was still "100% part of the Saturday crew" for pickleball and that he did not want her feel as though she was not part of that pickleball crew "no matter how our other conversations go."

30. Doe responded to Reese that same day at approximately 5:50 p.m. and said that she had just cancelled her membership at that pickleball gym and that she will miss playing with everyone, "but it's best that you and I cut ties at

4

this point." In this same text message Doe told Reese, "I wish you the best. Please take care of yourself."

31. Reese responded to that message at approximately 6:05 p.m. that same date, stating: "Sounds good! Just so you are aware I also have a membership at Ace. Please give my best to furbabies. Good luck to you[.]"

### D. The Parties' Interactions at the Pickleball Club on October 27, 2025

32. "Ace" is a reference to a different pickleball gym—Ace Pickleball Club—located in the Omaha, Nebraska, metropolitan area.

33. On or about October 27, 2025, Doe pulled into the parking lot at Ace Pickleball Club and witnessed Reese pull into the parking lot as well near in time to her arrival.

34. This made Doe uncomfortable, particularly given she had just communicated to him earlier that month that she had cancelled her membership at her old pickleball club and wanted to "cut ties" with Reese.

35. Reese attempted to converse with Doe on the Ace Pickleball facility grounds, but, while she remained cordial, Doe generally avoided Reese and tried to limit her communications and interactions with him.

36. At some point while the two were at Ace Pickleball on or about October 27, 2025, Doe conveyed to Reese that she no longer wanted to communicate with him, or words to that effect.

37. Security camera footage obtained from Ace Pickleball on or about October 27, 2025, captures some of the interactions between Reese and Doe.

38. That same security camera footage from Ace Pickleball on that date also shows that between approximately 5:59 p.m. and 6:00 p.m., Reese picked up Doe's phone and began manipulating and/or scrolling through it, at a point in time when Doe was not around.

39. Doe never gave consent—affirmative, implied, or otherwise—for Reese to possesses or otherwise access her phone at this date and time.

40. However, given their prior dating relationship, Reese had occasion to previously see Doe enter her passcode on her phone and that passcode was the same on October 27, 2025, as it was when they were dating.

41. Someone with access to Doe's phone on October 27, 2025, would have easily and quickly been able to see that Doe was in a relationship with someone other than Reese by looking at the recent text messages she had sent.

42. Doe and Reese left the pickleball facility separately.

### E. Doe Receives Unsolicited Communication from Unknown Persons

43. Within a couple of hours after leaving the pickleball facility on or about October 27, 2025, Doe began to receive unsolicited and concerning text message communications, including messages where the unknown number directly referred to Doe by her real first name and included comments of a sexual nature.

44. Specifically, Doe received unsolicited text messages from at least five unknown phone numbers between on or about October 27, 2025, at 7:57 p.m. and on or about October 29, 2025, at 9:39 p.m.

45. At the time Doe received these messages, she was in the District of Nebraska.

46. Each of these text messages were from numbers with either a 531-area code, a 402-area code, or a 712-area code, which are area codes generally associated with Eastern Nebraska or Western Iowa, to include the Omaha metropolitan area. Some of these text messages from unknown numbers referred to Doe by her real first name.

47. One of the messages that referred to Doe by her real first name also asked if she "wanted to party per [her] message" and further communicated—in explicit verbiage—that he was attracted to a picture he had seen of Doe's breasts as well as another sexually charged photograph depicting her vaginal area. When Doe responded to this individual and asked what he was referring to given that she had never communicated with this person, the unknown individual responded that Doe had "sent it to the group about a ln orgy" and subsequently clarified that it was on an "Omaha volleyball group on an app[.]"

48. Doe had previously sent pictures matching these descriptions to Reese during the course of their dating relationship with the understanding that they would not be further disseminated or shown to anyone else, but she had never sent them to anyone else and had certainly not posted them on an "Omaha volleyball group app." Nor had she ever posted anything online expressing interest in an "orgy."

6

49. Doe was able to specifically verify that she had previously sent a picture to Reese on or about August 20, 2024, that showed Doe's uncovered genitalia, pubic area, and anus, and also depicted sexually explicit conduct within the meaning of 15 U.S.C. § 6851(a)(6). This picture that she sent to Reese matched the description of what one of the unknown phone numbers claimed to have seen on the "Omaha volleyball group on an app" when he sent a text message to Doe and addressed her by her real first name.

50. Based on their prior dating relationship, Reese knew that Doe actively and regularly played intramural volleyball in the Omaha metropolitan area.

51. Another text message from a different unknown number asked Doe "[h]ow's the couple search going" and identified himself as "Mr j from kik[.]"

52. Another text message from a different unknown number refereed to Doe by her real first name.

53. Another text message from a different unknown number said "Id love to please you" and used Doe's real first name.

54. Another text message from a different unknown number said "You still like to have fun? This is high from Kik[.]"

55. In addition to these unsolicited text messages from at least five unknown phone numbers, Doe also received phone calls from unknown numbers on or about this same general timeframe, but she did not answer those calls.

56. In the midst of receiving these unsolicited communications from unknown phone numbers, Doe also received an unsolicited electronic communication from an individual using the Facebook Messenger social media platform (hereinafter, the "Facebook User") on or about October 27, 2025, at 10:47 p.m.

57. In his first message to Doe, the Facebook User said: "Do you have Kik app? If not someone post a pic and your phone number in a room on Kik. Just wanted to give u a heads up."

58. Doe responded to the Facebook User and asked if he would please send her screen shots of what had been posted.

59. The Facebook User then sent a screen shot which showed Doe lying on a bed taking a selfie with her unclothed breasts exposed (though partially scribbled over) and her other hand touching her underwear-clad vaginal area performing an act of masturbation.

60. Upon receiving this screenshot from the Facebook User, Doe immediately recognized this photograph as one she had previously sent to Reese—and only to Reese—during the course of their dating relationship.

61. The only difference between this picture that the Facebook User sent her and the picture that Doe had sent Reese, was that in the original picture she sent Reese there were no scribbled lines partially covering her breasts.

62. Doe was later able to verify that she had sent the original version of this picture to Reese on or about August 6, 2024.

63. Because Doe had never sent, disclosed, or otherwise shown these specific intimate visual depictions to anyone other than Reese, Doe was easily able to conclude that Reese was the individual who caused these intimate visual depictions to be disclosed.

64. Doe's decision to break off her relationship and her expressed desire to "cut ties" with Reese provides further circumstantial evidence in support of this conclusion.

65. All or some of these intimate visual depictions that Reese disclosed showed Doe's body, in whole or in part, such that she was identifiable by virtue of her face, likeness, or other distinguishing characteristic, or from information displayed in connection with all or some of these intimate visual depictions.

66. At that point in time, Doe had neither sent nor otherwise shown these intimate visual depictions to anyone else apart from Reese.

67. After learning that these intimate visual depictions of her had been disclosed without her consent, Doe reported this matter to law enforcement officials, and petitioned for a protection order against Reese in State Court. A protection order was subsequently granted on or about January 5, 2026.

### F. The Kik App

68. The United States Court of Appeals for the Eighth Circuit has previously described Kik as follows: "Kik is a free app available on most mobile platforms and "allows people to find strangers and communicate with them anonymously."' *United States v. Jauron*, 832 F.3d 859, 862 (8th Cir. 2016) (citing Sheryl Gay Stolberg & Richard Perez–Pena, App Provides Anonymity to Tennagers [sic], and to Predators, Too, N.Y. Times Feb. 5, 2016, at A1, 3.)).

69. In 2016, the Eighth Circuit noted that "Kik has approximately 275 million registered users worldwide." *Id.* (citing same).

70. According to Kik's own website as it appeared on November 21, 2025, "Kik is an iOS and Android app that lets you connect with friends and groups from all around the world through messaging, chatting, and live streaming" and "Kik uses your existing data plan or Wi-Fi to send and receive messages, including content messages from Kik webpages (videos, images, sketches, memes, and more)."

### G. The Damage to Doe and the Harm She Will Continue to Suffer

71. Doe owns and operates a state-licensed childcare business in the District of Nebraska that is located at her home address.

72. Doe uses the same cell phone number for her personal communications as well as for her business communications, and this cell phone number is prominently listed on her business's website along with her shared home/business address and additional personal identifying information pertaining to Doe.

73. When one types Doe's cell phone number into the search engine Google, it populates information listing Doe's home childcare and preschool business, including Doe's real first and last name, the precise address of Doe's home/business, pictures of Doe's home/business, and associated "Google Reviews" for Doe and her business that further identify Doe by her real name. It also provides a link to Doe's business website which includes personal identifying information about Doe, her address, her credentials, and information on how to contact Doe using the same phone number.

74. Furthermore, when one types Doe's cell phone number into the search engine Google, it also populates a link to a Child Care Licensing Roster promulgated by the Nebraska Department of Health and Human Services which directly ties this cell phone number to Doe's real first and last name as well as her shared home and business address in Nebraska.

75. In fact, the Facebook User who informed Doe that an intimate visual depiction of her had been posted on Kik was able to find Doe on Facebook after he typed the phone number that appeared on the Kik post into a search engine and immediately saw that it related to someone with Doe's real first and last name who owned a daycare in Nebraska.

76. Doe lives at this shared home/business address with her teenage daughter, and the manner in which Doe's intimate visual depictions were disclosed to an unknown population of individuals online along with identifying information that makes Doe's address easily and immediately ascertainable

9

through use of an internet search engine has caused her to suffer both physical harm and emotional distress. Doe will also continue to suffer physical harm and emotional distress in the future as a result.

77. The disclosure of Doe's intimate visual depictions has also economically harmed—and will continue to economically harm—Doe's professional reputation within her community given the nature of her business.

78. In an effort to protect herself from future harm by Reese, Doe applied for and received a protection order against Reese in Nebraska State Court. Because Reese contested that protection order, requested a hearing, and, through counsel, called Doe as a witness to testify publicly in open court about this matter, this exacerbated Doe's damages and caused her to suffer further humiliation, embarrassment, and emotional distress.

## CAUSES OF ACTION

### COUNT I:
### Nonconsensual Disclosure of Intimate Visual Depictions
### (Federal Statutory Cause of Action: 15 U.S.C. § 6851, *et seq*.)

79. Plaintiff incorporates the foregoing paragraphs, as if fully set forth herein.

80. In accordance with 15 U.S.C. § 6851, a qualifying "individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without the consent of the individual, where such disclosure was made by a person who knows that, or recklessly disregards whether, the individual has not consented to such a disclosure, may bring a civil action against that person in an appropriate district court of the United States[.]" 15 U.S.C. § 6851(b)(A).

81. A different subsection of this same statute provides that in such a civil action, among other remedies, "an individual may recover the actual damages sustained by the individual or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred[.]" 15 U.S.C. § 6851(b)(3)(i).

82. On or about October 27, 2025, Reese intentionally caused intimate visual depictions of Doe to be disclosed in or affecting interstate or foreign commerce or using any means or facility of interstate commerce, without the consent of Doe, and this disclosure caused harm to Doe.

83. These intimate visual depictions consisted of electronic media that showed, among other things: (1) Doe's uncovered genitals, pubic area, anus, and/or post-pubescent female nipple, and (2) Doe engaging in "sexually explicit conduct," as that term is defined by 15 U.S.C. § 6851(a)(6).

84. At the time Reese intentionally caused said disclosure of Doe's intimate visual depictions, he did so knowing that Doe had not consented to such disclosure.

85. In the alternative, and at the very least, at the time Reese intentionally caused said intimate visual depictions of Doe to be disclosed, he recklessly disregarded whether Doe had not consented to such disclosure.

86. At the time Reese intentionally caused said disclosure, Doe's intimate visual depictions were not a matter of public concern or public interest.

87. At the time Reese intentionally caused said disclosure, he was not acting in good-faith or with any legally authorized basis for doing so.

88. The intimate visual depictions of Doe that Reese intentionally caused to be disclosed depicted Doe's body in whole or in part, such that she was identifiable by virtue of her face, likeness, and/or other distinguishing characteristics, to include—among other things—a distinctive piercing, as well as from other information displayed in connection with the visual depictions such as her real first name and her real phone number including an area code germane to the Omaha, Nebraska metropolitan area.

89. Wherefore, Doe respectfully requests that this Honorable Court award her relief in accordance with 15 U.S.C. § 6851(b)(3) to include Doe's actual damages (including damages for physical harm, economic harm, and emotional distress) or liquidated damages in the amount of $150,000.00 (whichever is greater), punitive damages to the extent authorized by law, the costs of this action, reasonable attorney's fees, and other litigation costs reasonably incurred. Doe further requests that this Honorable Court fashion appropriate equitable relief to include, among other things, issuing a permanent injunction ordering Reese to cease display or disclosure of Doe's intimate visual depictions, to destroy and delete all copies of Doe's intimate visual depictions that are in his possession, and to affirmatively notify Doe of any and all other individuals or entities—to include websites or social media platforms—that may have received or be in possession of copies of Doe's intimate visual depictions so that Doe may seek their destruction and deletion from these individuals and/or entities.

## COUNT II:
### Uniform Civil Remedies for Unauthorized Disclosure of Intimate Images
### (Nebraska Statutory Cause of Action: Neb. Rev. Stat. § 25–3501, *et seq.*)

90. Plaintiff incorporates the foregoing paragraphs, as if fully set forth herein.

91. In accordance with Neb. Rev. Stat. § 25–3503, except as otherwise provided, "a depicted individual who is identifiable and who suffers harm from a person's intentional disclosure or threatened disclosure of an intimate image that was private without the depicted individual's consent has a cause of action against the person if the person knew or acted with reckless disregard for whether: (1) the depicted individual did not consent to the disclosure; (2) the intimate image was private; and (3) the depicted individual was identifiable." Neb. Rev. Stat. § 25–3503(b).

92. Under this statutory scheme, a prevailing plaintiff may recover as compensation economic and noneconomic damages proximately caused by the defendant's disclosure or threatened disclosure, including damages for emotional distress whether or not accompanied by other damages; or presumed damages not to exceed ten thousand dollars against each defendant in an amount that bears a reasonable relationship to the probable damages incurred by the prevailing plaintiff; and an amount equal to any monetary gain by the defendant from disclosure of the intimate image. *See* Neb. Rev. Stat. § 25–3505(a). Additionally, in an action under this act, the court may award a prevailing plaintiff both reasonable attorney's fees and costs as well as additional relief including injunctive relief. *See* Neb. Rev. Stat. § 25–3505(b).

93. On or about October 27, 2025, Reese intentionally caused intimate visual depictions of Doe to be disclosed in or affecting interstate or foreign commerce or using any means or facility of interstate commerce, without the consent of Doe, and this disclosure caused harm to Doe.

94. These intimate visual depictions consisted of electronic media that showed, among other things: (1) Doe's uncovered genitals, pubic area, anus, and/or post-pubescent female nipple, and (2) Doe engaging in "sexual conduct," as that term is understood within the meaning of Neb. Rev. Stat. § 25-3502.

95. These intimate visual depictions that Reese intentionally caused to be disclosed were private and were disclosed without Doe's consent.

96. At the time Reese intentionally caused said disclosure of Doe's intimate visual depictions, he did so knowing that Doe had not consented to such disclosure.

97. In the alternative, and at the very least, at the time Reese intentionally caused said intimate visual depictions of Doe to be disclosed, he recklessly disregarded whether Doe had not consented to such disclosure.

98. At the time Reese intentionally caused said disclosure, Doe's intimate visual depictions were not a matter of public concern or public interest.

99. At the time Reese intentionally caused said disclosure, he was not acting in good-faith or with any legally authorized basis for doing so.

100. The intimate visual depictions of Doe that Reese intentionally disclosed, depicted Doe's body in whole or in part, such that she was identifiable by virtue of her face, likeness, and/or other distinguishing characteristics, to include—among other things—a distinctive piercing, as well as from other information displayed in connection with the visual depictions such as her real first name and her real phone number including an area code germane to the Omaha, Nebraska metropolitan area.

101. Wherefore, Doe respectfully requests that this Honorable Court award her relief in accordance with Neb. Rev. Stat. § 25–3505 to include Doe's actual damages (including damages for physical harm, economic harm, and emotional distress) or presumed damages in the amount of $10,000.00 (whichever is greater), the amount equal to any monetary gain made by Reese from the disclosure of Doe's intimate visual depictions (if any), the costs of this action, reasonable attorney's fees, and other litigation costs reasonably incurred. Doe further requests that this Honorable Court fashion appropriate equitable relief to include, *inter alia*, issuing a permanent injunction ordering Reese to cease display or disclosure of Doe's intimate visual depictions, to destroy and delete all copies of Doe's intimate visual depictions that are in his possession, and to affirmatively notify Doe of any and all other individuals or entities—to include websites or social media platforms—that may have received or be in possession of copies of Doe's intimate visual depictions so that Doe may seek their destruction and deletion from these individuals and/or entities.

## COUNT III
## False Light Invasion of Privacy
**(Nebraska Statutory Cause of Action: Neb. Rev. Stat. § 20–201, *et seq.*)**

102. Plaintiff incorporates the foregoing paragraphs, as if fully set forth herein.

103. The Nebraska State Legislature, through statute, has provided for "a right of privacy" with the express intention of giving "to any natural person a legal remedy in the event of violation of the right." Neb. Rev. Stat. § 20–201.

104. Pursuant to Neb. Rev. Stat. § 20–204, "Any person, firm, or corporation which gives publicity to a matter concerning a natural person that places that person before the public in a false light is subject to liability for invasion of privacy, if: (1) The false light in which the other was placed would be highly offensive to a reasonable person; and (2) The actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

105. Doe is a natural person, and by intentionally causing disclosure of Doe's intimate visual depictions in the manner in which he did, Reese gave publicity to a matter concerning Doe.

106. This placed Doe in a false light because, contrary to what was conveyed in the social media posts accompanying her intimate visual depictions, Doe was not soliciting herself or seeking to engage in any form of sexual activity from a random, unknown online population.

107. At the time Reese intentionally caused said disclosure, Doe's intimate visual depictions were not matters of public concern or public interest.

108. These intimate visual depictions consisted of electronic media that showed, among other things: (1) Does' uncovered genitals, pubic area, anus, and/or post-pubescent female nipple, and (2) Doe engaging in sexually explicit conduct, as that term is defined by 15 U.S.C. § 6851(a)(6), as well as "sexual conduct" as that term is understood within the meaning of Neb. Rev. Stat. § 25–3502.

109. At the time Reese intentionally caused said disclosure, he was not acting in good-faith or with any legally authorized basis for doing so.

110. At the time Reese intentionally caused said disclosure, he was prompted by and acting with actual malice.

111. By falsely suggesting that Doe was soliciting or seeking to engage in such sexual activity, this placed her in a false light that would be highly offensive to a reasonable person.

112. This false light was, in fact, highly offensive to Doe.

113. This false light was especially offensive to Doe given her profession and reputation as a licensed, in-home childcare provider and the fact that she holds herself out and advertises herself in the Omaha, Nebraska metropolitan area as an in-home child care provider.

114. At the time Reese intentionally caused Doe to be placed in this false light, he had knowledge of or—at the very least acted in reckless disregard—as to the falsity of the publicized matter and the false light in which Doe would be placed.

115. Wherefore, Doe respectfully requests that this Honorable Court award her damages to the extent authorized by Nebraska law including, but not necessarily limited to, compensatory damages for the physical harm, economic harm, mental suffering, and emotional distress suffered by Doe, and general damages for the harm done to Doe's privacy rights to solitude, seclusion, and personal dignity.

## COUNT IV:
### Intentional Infliction of Emotional Distress (IIED)
### (Nebraska Common Law Cause of Action)

116. Plaintiff incorporates the foregoing paragraphs, as if fully set forth herein.

117. Nebraska law permits plaintiffs to bring causes of action based upon the common law tort of intentional infliction of emotional distress. *See e.g.*, *Iwanski v. Gomes*, 259 Neb. 632, 637 (2000).

118. The Nebraska Supreme Court has "delineated three elements for a cause of action based on the tort of intentional infliction of emotional distress: (1) that there has been intentional or reckless conduct; (2) that the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community; and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it." *Nichols v. Busse*, 243 Neb. 811, 817 (1993) (cleaned up); *accord Brandon ex rel. Est. of Brandon v. Cnty. of Richardson*, 261 Neb. 636, 656 (2001).

15

119. Reese's actions in causing disclosure of Doe's intimate visual depictions were intentional or, at the very least, reckless.

120. These intimate visual depictions consisted of electronic media that showed, among other things: (1) Does' uncovered genitals, pubic area, anus, and/or post-pubescent female nipple, and (2) Doe engaging in "sexually explicit conduct," as that term is defined by 15 U.S.C. § 6851(a)(6), as well as "sexual conduct" as that term is understood within the meaning of Neb. Rev. Stat. § 25–3502.

121. At the time Reese intentionally caused said disclosure, Doe's intimate visual depictions were not a matter of public concern or public interest.

122. At the time Reese intentionally caused said disclosure, he was not acting in good-faith or with any legally authorized basis for doing so.

123. Reese's conduct in causing disclosure of Doe's intimate visual depictions was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community.

124. Reese's conduct in causing disclosure of Doe's intimate visual depictions caused emotional distress to Doe that is so severe no reasonable person should be expected to endure it.

125. Wherefore, Doe respectfully requests that this Honorable Court award her damages to the extent authorized by Nebraska law including, but not necessarily limited to, compensatory damages for the mental suffering, emotional distress, and related expenses attendant thereto, that Doe has suffered and/or will continue to suffer as the result of Reese's conduct set forth above.

## JURY DEMAND AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this matter be tried to a jury in Omaha, Nebraska, that the Court find that Defendant William Reese is liable to Plaintiff Jane Doe under each of the Counts she has brought in this Complaint and for the relief sought therein, and that this Court further enter judgment in favor of Plaintiff Jane Doe and against Defendant William Reese in the following amounts:

A. Compensatory damages, to include damages for the physical harm, economic harm, mental suffering, and emotional distress that Plaintiff Jane Doe has incurred and will continue to incur;

B. Liquidated damages in the amount prescribed for by federal law;

C. Presumed damages in the amount prescribed for by Nebraska state law;

D. Punitive damages to punish and deter the reprehensible conduct alleged in the Complaint, to the extent authorized by federal law;

E. General damages as available under Nebraska law;

F. Nominal damages;

G. Pre-judgment interest and post-judgment interest to the extent authorized by law;

H. Reasonable attorney's fees;

I. The costs of this action;

J. Additional damages as are proven at trial;

K. Equitable relief, to include in the form of a permanent injunction, ordering Defendant William Reese to cease display or disclosure of Doe's intimate visual depictions, to destroy and delete all copies of Doe's intimate visual depictions that are in his possession, and to affirmatively notify Doe of any and all other individuals or entities—to include websites or social media platforms—that may have received or be in possession of copies of Doe's intimate visual depictions so that Doe may seek their destruction and deletion from these individuals and/or entities; and

L. Such other relief as this Court deems equitable and proper.

**DATED this 12th day of January 2026.**

JANE DOE,

By: */s/ Ryan S. Crnkovich*
Ryan S. Crnkovich., NE Bar No. #25741
Dornan, Howard, Breitkreutz, Dahlquist, & Klein PC, LLO
1403 Farnam Street, Suite 232
Omaha, NE 68102
(402) 884-7044
(402) 884-7045 fax
ryan@dltlawyers.com
Attorney for Plaintiff